UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DARRYL  PIERCE and | ) | |
| SHARON PIERCE, On Behalf Of | ) | |
| Themselves And All Others Similarly | ) | |
| Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 1:05-cv-01325-LJM-DKL |
| | ) | |
| VISTEON CORPORATION, and | ) | |
| VISTEON SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL**

Plaintiffs Darryl and Sharon Pierce (these two plaintiffs, collectively, "Plaintiffs"),

on behalf of themselves and all other similarly situated (collectively, the "Class") and

Defendants Visteon Corporation and Visteon Systems, LLC (collectively, "Visteon"),

have submitted the Class allegations to the Court for ruling based on briefs supported

by evidence in *lieu* of a Bench Trial.  Generally, the Class asserts that Visteon violated

the Consolidated Ominbus Reconciliation Act ("COBRA"), 29 U.S.C. § 1166, when it

failed to send timely notice of COBRA benefits to the class members.  The Class seeks

to recover statutory and equitable damages and attorney's fees pursuant to the

Employee Retirement Income Security Act ("ERISA"), 29, U.S.C. § 1132(c)(1).  The

Court has considered the parties' briefs and the evidence and now enters the following Findings of Fact and Conclusions of Law.[1]

## I. <u>VISTEON'S MOTION TO STRIKE</u>

As a preliminary matter, Visteon has moved to strike certain trial affidavits of putative class members John Huffman ("Huffman") and Leesa Wyatt ("Wyatt"). Dkt. No. 256. On February 27, 2013, the Court issued an Order to accommodate the parties' request to submit this case by briefs in *lieu* of a Bench Trial. Dkt. No. 246. In relevant part, the Court directed counsel for Plaintiffs to "provide to Visteon all declarations for the witnesses they have disclosed on or before Friday, March 1, 2013, to allow Visteon to prepare for and schedule the requisite depositions. Plaintiffs shall cooperate with Visteon, including making their witnesses available, to ensure that all such depositions are completed on or before March 15, 2013." *Id.* Thereafter, Plaintiffs provided a single signed affidavit from each of the following eight individuals: Wyatt, Kimberly Davidson, Alice Whitecotton, Jeanene Hensley ("Hensley"), Jessica Wells, Donna Parrett, Katherine Alfred, and Greta Mae Steele. Dkt. Nos. 291-1 & 291-2.

On March 14, 2013, Visteon questioned the eight individuals for whom affidavits had been provided. Plaintiffs had an opportunity to redirect the witnesses as well. During Hensley's deposition, Plaintiffs' counsel asked her whether or not her job had moved to Mexico. Dkt. No. 291-3, Hensley Dep. at 20. Hensley answered the question in the negative. *Id.* Apparently, if that were the case, Hensley might have a claim for

---

[1] Where appropriate or necessary, each of the following Findings of Fact shall be considered a Conclusion of Law, and each of the following Conclusions of Law shall be considered a Finding of Fact.

Trade Adjustment Assistance ("TAA") benefits.   Dkt. No. 291, at 2.   During Wyatt's deposition, Plaintiffs asked no questions.   Dkt. No. 291-4, Wyatt Dep. at 32.

On April 2, 2013, Plaintiffs filed their Trial Brief and supporting evidence.   Dkt. No. 249.   Part of Plaintiffs' evidence was a previously undisclosed trial affidavit from Huffman regarding his alleged entitlement to equitable monetary compensation and purported eligibility for TAA benefits.   Dkt. No. 256-2, Huffman Aff.   In addition, Plaintiffs filed a second trial affidavit of Wyatt.   Dkt. No. 255-3, Wyatt 2d Aff.   Wyatt's second affidavit addressed her purported eligibility for TAA benefits.   *Id.*

Visteon asserts that it has been prejudiced by Plaintiffs' failure to provide Huffman's affidavit and Wyatt's second affidavit prior to the Court-ordered deadline. The company argues that the non-disclosure prevented Visteon from deposing Huffman at all and prevented Visteon from questioning Wyatt about her purported eligibility for TAA benefits during her deposition.   As further prejudice, Visteon cites Plaintiffs' failure to elicit Wyatt's testimony about her purported TAA benefit eligibility themselves when they had the opportunity to do so during her deposition.   Because this is a trial based on written briefs and submitted evidence, Visteon has been deprived of the opportunity to cross-examine Huffman and Wyatt about their new assertions.

Although Visteon never cites a rule or standard, Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), provides for sanctions under two of the circumstances alleged here: failure to follow a discovery order and failure to disclose or supplement. Fed. Rs. Civ. P. 37(b)(2)[2] & 37(c)(1).[3]   The Court has "significant flexibility in the

---

[2] Rule 37(b)(2)(A) states, in relevant part:

application of the rules in question, [but] that latitude is clearly constrained by the principles of due process of law." *Slagado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 740 (7th Cir. 1998). *See also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755-56 & 758-59 (7th Cir. 2004) (discussing the discretionary standard for sanctions under Rule 37(c)(1) and the concept of proportionality).

Plaintiffs argue that they did not recognize the need for testimony regarding TAA benefits until after settlement efforts failed. Dkt. No. 294, at 1. In addition, Plaintiffs contend that Visteon was not prejudiced because it could not meaningfully cross-examine either Wyatt or Huffman about this subject because "either Ms. Wyatt and Mr. Huffman have personal knowledge that they were eligible for TAA benefits or not.

---

If a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: . . . (ii) prohibiting the disobedient party . . . from introducing designated matters in evidence; (iii) striking pleadings in whole or in part . . . .

In addition, Rule 37(b)(2)(C) states, in relevant part: "If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may issue any of the orders listed in Rule 37(b)(2)(A)((i)-(vi), unless the disobedient party shows that it cannot produce the other person."

[3] Rule 37(c)(1) states, in relevant part:

If a party fails to provide information or identify witnesses as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
* * *
(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

4

Cross examination would only result in confirmation of the testimony provided." *Id.* at 2. Further, Plaintiffs contend that Visteon has had "sufficient time to obtain and present rebuttal evidence establishing the knowledge of Ms. Wyatt and/or Mr. Huffman was incorrect." *Id.* Plaintiffs also assert that Visteon's late production of evidence has been excused in this case multiple times; therefore, it is "okay" for Plaintiffs to disclose these affidavits late as well. *Id.*

Under either aspect of Rule 37, Huffman's affidavit and Wyatt's second affidavit must be excluded from evidence. Using the more specific standard enunciated in Rule 37(c)(1), the Court concludes that Plaintiffs were without substantial justification in omitting Huffman as a witness and failing to disclose at Wyatt's deposition that she was also claiming that she was entitled to TAA benefits. This case has been pending since 2005. By approximately June 19, 2007, *see* Dkt. Nos. 87, 88, 97, 98 & 101, the date that Plaintiffs obtained from Visteon the names of putative class members; but no later than October 31, 2007, the approximate date that notice was sent to putative class members, *see* Dkt. Nos. 107, 199; Plaintiffs had an opportunity to canvass putative class members and discover whether any of them had either actual monetary damages or other benefits-related claims. Plaintiffs' failure to identify all putative class members who might be entitled to TAA benefits in the ensuing time cannot be rewarded by allowing them to provide such evidence late and in what amounts to a trial by ambush. Further, Plaintiffs sought, and received, over Visteon's objection, additional time to name their witnesses as recently as February 20, 2013. Dkt. No. 244. Therefore, it is difficult for the Court to conclude that there is any justification, much less substantial justification, for Plaintiffs' failure to name Huffman as a witness in a timely manner or to

provide Wyatt's testimony regarding her claim that she is entitled to TAA benefits within the Court-ordered deadlines.

In addition, the Court agrees with Visteon that the late disclosures were not harmless. This is a Bench Trial by brief. Therefore, the Court made it clear to the parties that they must exchange the affidavits they intended to rely upon as evidence within enough time for the opposing party to depose the affiant if they wished. Dkt. No. 246, at 2. That procedure was necessary to ensure that each party had an opportunity to cross-examine the witnesses in the same manner they would have had if the witnesses appeared in Court. Plaintiffs have deprived Visteon of that opportunity with respect to Huffman's testimony by affidavit in its entirety, and with respect to Wyatt's second affidavit regarding her allegations that she was entitled to TAA benefits. Plaintiffs had ample opportunity to name Huffman prior to the deadline and to elicit Wyatt's testimony on the TAA benefits issue at her deposition, but did not do so.

Plaintiffs' argument that Visteon has had plenty of time to collect rebuttal evidence is also without merit in light of the timing presented above, which indicates that Visteon's first notice of Plaintiffs' intent to rely upon Wyatt's new affidavit and the entirely new affidavit of Huffman was when Plaintiffs filed their trial brief. Moreover, the Plaintiffs provide no evidence of the timing of any alleged settlement negotiations regarding these claims; therefore, there is no other reasonable explanation for Plaintiffs' failure to produce the affidavits timely except to surprise Visteon.

Further, Plaintiffs' production of these new affidavits stands on different footing than Visteon's late production of evidence related to the COBRA notice provided to certain putative class members. Plaintiffs had ample opportunity to review Visteon's

late production; to depose relevant witnesses if they chose; and to challenge consideration of this evidence.  The new affidavits, however, were filed with Plaintiffs' bench brief, and are meant to stand in the place of testimony at trial in open court.  As previously stated, the Court stressed with the parties during the Final Pretrial Conference that, because there would be no opportunity to present witnesses live and thereby cross-examine them in open court, the parties must be provided the opportunity to depose the witnesses the other party intended to rely upon before any briefs were filed.  Plaintiffs' failure to follow the Court's pretrial order in this regard has deprived Visteon, and the Court, of testimony on cross-examination, which is regarded "as an essential safeguard of the accuracy and completeness of testimony."  1 McCormick on Evid. § 19 (7th Ed. Mar. 2013).  Indeed, it is for this very reason that the hearsay rule exists – to ensure the reliability of evidentiary matters stated or made outside of the courtroom.  Absent meaningful cross-examination or some other indicia of reliability (for which Plaintiffs provide no argument), Wyatt's second affidavit and Huffman's affidavit are nothing more than out-of-court statements that Plaintiffs are relying upon for the truth of the matters stated therein and are inadmissible under the hearsay rule.  Fed. Rs. Evid. 801(c) & 802.

For these reasons, Visteon's Motion to Strike is **GRANTED**.  The Court will not consider the Huffman affidavit in its entirety or Wyatt's second affidavit regarding TAA benefit issues.

## II. <u>FINDINGS OF FACT</u>

### A. VISTEON'S BENEFIT ADMINISTRATION SYSTEM

In January 2000, Visteon was incorporated as a wholly-owned subsidiary of Ford Motor Company ("Ford").  Dkt. No. 268-1, Manley Decl. ¶ 4.  Visteon was spun off from Ford and became an independent company on June 29, 2000.  Dkt. No. 268-2, Metzigian Dep. at 13.  During the time period at issue in this case, Visteon had a workforce of approximately 35,500 employees who worked at a network of manufacturing sites, technical centers, sales offices and joint ventures located throughout the United States and other geographic regions throughout the world. Manley Decl. ¶ 3.

Visteon employees generally become eligible for healthcare benefits on the first day of the fourth month following their date of hire.  Metzigian Dep. at 405.  Typical benefits available include medical, dental and vision coverage.  *Id.* at 128-29. Employees that elect to enroll in benefits are provided with a copy of Visteon's summary plan description ("SPD") regarding those benefits.  Dkt. No. 269-1, Metzgian Trial Decl. ¶ 10 ("Metzgian Tr. Decl.").  The SPD contains information about COBRA, including information on the circumstances under which COBRA applies, and the duration of COBRA.  *Id.*  The SPD also identifies the COBRA Administrator, provides the address and telephone number of the COBRA Administrator, and directs employees to contact the COBRA Administrator if the employee has any questions regarding COBRA.  *Id.*  In the event an employee leaves employment at Visteon, their coverage does not terminate immediately; rather the coverage will continue until the end of the month in which the employee leaves the company.  Metzigian Dep. at 216-17.

8

In general, Visteon uses an automatic data feed system that electronically communicates changes in an employee's personnel record to its payroll, benefits, and COBRA administrators.  Dkt. No. 269-2, Defs.' Supp. Resps. To Pls.' First & Second Set of Interrogatories, at 7 ("Defs.' Supp. ROG Resps.").  For example, when an employee is terminated, the information is entered into the timekeeping system by the respective Visteon facility's Human Resources ("HR") Department.  Metzigian Dep. at 33, 304.  That information is then communicated electronically through an automatic data feed, which first goes to the payroll administrator (to process final pay); then to the benefits administrator (to terminate active coverage); and thereafter, to the COBRA administrator (to send out a COBRA notice to the employee and to manage COBRA if the employee elected benefits).  *Id.* at 22-23, 26-27, 33, 304, 314.  The COBRA notice sent to the employee would apply to any and all coverage the employee was enrolled in at the time of his or her qualifying event.  *Id.* at 135.

The specifics of the process, however, appear more complicated because one company did not necessarily perform all three functions.  In the year 2000, when Visteon was spun off from Ford, Visteon inherited the same process and systems utilized by Ford, including payroll, benefits and COBRA administration functions.  *Id.* at 19; Metzigian Tr. Decl. ¶ 4.  Visteon was the plan administrator for its group plans, including medical, dental and vision benefits, but Visteon and Ford entered into a service agreement in which Ford agreed to continue to manage all of the administration of benefits for Visteon until Visteon could become independent in those areas.  Metzigian Dep. at 16.  This agreement ran from June 29, 2000, to May 31, 2002.  *Id.*  During that time period, Ford was the third-party administrator ("TPA") for Visteon.  *Id.*

Ford's system included entering a qualifying event into Ford's timekeeping system, which would then feed to the Ford payroll department, which would feed to the Ford health care or health and welfare system. *Id.* at 33. The Ford payroll department would generate a COBRA notice. *Id.* at 33, 314. However, Visteon was unaware that Ford's payroll department was sending out COBRA notices until sometime in late 2008. *Id.* at 346.

After the contract with Ford expired, Visteon had several benefit administrators: From June 1, 2002, through May 31, 2008, Tower-Perrin, which later became EDS and eventually became ExcellerateHRO, was a benefit administrator for certain Visteon employees. *Id.* at 23. Towers-Perrin made an electronic feed weekly to the COBRA administrator. *Id.* at 26. Unicare was the COBRA administrator until Conexis replaced it in August 2004. *Id.* at 27, 29-30.

Visteon provided the following chart illustrating the administrators with whom Visteon had contracts to perform various functions at various times relevant to the Class claims:

| Time Period | Payroll Administrator | Benefits Administrator | COBRA Administrator |
|---|---|---|---|
| 06/29/00 – 05/31/02 | Ford Payroll | Ford NESC | Unicare |
| 06/01/02 – 03/31/03 | Ford Payroll | Towers-Perrin | Unicare |
| 04/01/03 – 07/31/04 | Fidelity | Towers-Perrin | Unicare |
| 08/01/04 – 05/31/08 | Fidelity | Towers-Perrin | Conexis |
| 06/01/08 – 12/31/09 | Fidelity | Morneau Sobeco | Morneau Sobeco |
| 01/01/10 – Present | UltiPro | Morneau Sobeco | Morneau Sobeco |

Metzingen Tr. Decl. Ex. A.

In addition, Visteon's Manager of Health and Welfare and Worker's Compensation Benefits, Shirah Metzigian ("Metzigian") testified that for an unknown

period of time, Ceridian acted as both a benefit administrator and a COBRA administrator for certain Visteon facilities.  *Id.* at 30.

Also for an unspecified period of time, Diamond was a benefit administrator and a COBRA administrator for certain Visteon facilities.  *Id.* at 79.  However, Infinisource sent out COBRA notices for Diamond.  *Id.* at 131-32.

Upon initial selection, Visteon conducted quality assurance testing with respect to each payroll, benefits and COBRA administrator that it retained.  Metzigian Dep. at 31-32.  The quality assurance testing lasted approximately sixty (60) days and involved multiple meetings between Visteon and the relevant administrator groups.  *Id.* at 153-56, 162-63.  Visteon also required its third-party vendors to keep records of their actions as a condition of their retention.  Metzigian Tr. Decl. ¶ 5.  However, beyond the initial testing, Visteon never did anything to check or make certain that COBRA notices were being sent out by its TPAs.  Metzigian Dep. at 159.

In fact, Visteon plants did not report to Visteon's HR Department how many people separated employment or how many people had qualifying events on any type of periodic basis.  *Id.* at 42.  Nor was there a procedure in place for Visteon's HR Department to learn of such information.  *Id.* at 301.

While the service agreement was in place with Ford, for example, Visteon did not have any information about the status of its employees; Ford had all of this information.  *Id.* at 32-35.  Neither Ford nor Unicare communicated anything to Visteon about qualifying events or confirmed that COBRA notices were sent.  *Id.* at 152, 158-59, 306-07.  In addition, Visteon never audited Ford or Unicare to determine if the companies had properly sent out COBRA notices.  *Id.* at 152-53, 306-07.

Similarly, neither Towers-Perrin/EDS nor Unicare communicated anything to Visteon about data sent to the COBRA administrator. *Id.* at 158-59. Neither Towers-Perrin/EDS nor Unicare reported to Visteon the names or number of employees who had qualifying events and Visteon never asked for this information. *Id.* at 158-59, 304-07. Like with Ford, Visteon never audited Towers-Perrin/EDS or Unicare. *Id.* at 305-06.

Conexis never reported to Visteon the type or number of COBRA notices sent and Visteon never asked for this information. *Id.* at 307-08. Visteon never audited Conexis to check or make certain that COBRA notices were sent. *Id.*

Ceridian never reported to Visteon, and Visteon never asked for information regarding COBRA notices that were sent or to whom. *Id.* at 308-09. Visteon never audited Ceridian to check or make certain that COBRA notices were sent. *Id.*

According to Visteon, if a supervisor or a HR representative received a call from an employee concerning COBRA, he or she was responsible for directing the employee to the Visteon Benefits Center at the company's headquarters in Michigan or to a COBRA administrator. *Id.* at 160-61. Visteon claims that no such calls were reported to the Visteon Benefits Center. *Id.* at 159-62. After this lawsuit was filed and apparently during its investigation of Plaintiffs' claims, an undisclosed number of case notes, for an undesignated period of time, from Visteon's COBRA administrators were reviewed by Visteon and there were no notes to indicate that employees had complained to Visteon's COBRA administrators about problems with issuance of COBRA notices. *Id.* at 284-85. The union serving Visteon has not reported any issues regarding COBRA notices either. Metzigian Tr. Decl. ¶ 7.

However, Sharon Pierce ("Sharon"), Jessica Wells ("Wells"), Donna Parrett ("Parrett"), Katherine Alford ("Alfred") and Kimberly Davidson ("Davidson"), all putative class members, testified that each of them had contacted the HR office at their respective plant to inquire about COBRA benefits.  Dkt. Nos. 254-1, Sharon Pierce Aff. ¶ 5 ("Sharon's Aff."); 255-1, Wells Dep. at 18-19; Parrett Aff. ¶ 8; 256-4, Parrett Dep. at 10-11, 13; 257-3, Alfred Aff. ¶ 18; 257-4, Alfred Dep. at 23-25; 258-1, Davidson Aff. ¶ 17; 258-2, Davidson Dep. at 22-23.   There is also credible evidence that the Department of Labor ("DOL") had contacted Pam Hicks ("Hicks"), an HR representative at the Connersville plant as well as the Visteon benefits center, regarding the Plaintiffs' complaints about not receiving a COBRA notice.  Metzigian Dep. at 163-65 & Dkt. No. 249-1, Metzigian Dep. Ex. 1, Dep't of Labor Letter to the Hon. Michael R. Pence, U.S. House of Representatives, Aug. 15, 2005 ("DOL Letter").

In the summer of 2007, approximately two years after this suit was filed, Visteon implemented a formal weekly auditing process with its TPAs to ensure that all qualifying events line up with the issuance of a timely COBRA notice.   Metzigian Tr. Decl. ¶ 13. The new process involves comparing the number of qualifying events reported to the administrator with the number of COBRA packages actually sent and measuring compliance with the statutory COBRA period for sending the notices.  *Id.* ¶ 14.  Other performance criteria were also put in place to measure compliance with COBRA.  *Id.* ¶ 14; Dkt. No. 278-1, Metzigian Dep. in *Shedlock v. Visteon Corp.*, at 32-33 ("Metzigian *Shedlock* Dep.").   In addition, Visteon streamlined its COBRA notification process by using the same administrator for both benefits and COBRA notices.  Metzigian Tr. Decl. Ex. A.

## B.  EVENTS LEADING TO THIS LAWSUIT

### 1.  <u>Darryl & Sharon Pierce</u>

Plaintiffs were employed at Visteon's Connersville, Indiana, facility.  Manley Decl. ¶¶ 18-19.  In December 2004, Plaintiffs were laid off and their benefits expired at the end of the month, per company policy, on December 31, 2004.  Neither of the Plaintiffs received a COBRA notice.  Sharon's Aff. ¶¶ 3-4.

Sharon made several phone calls to Hicks, the HR manager at the Connersville plant where the Plaintiffs had worked, to inquire about their COBRA notices.  *Id.* ¶ 5. When they did not receive their notices despite Sharon's calls, Sharon contacted the office of then Congressman Michael R. Pence ("Congressman Pence") regarding the lack of notice.  *Id.* ¶ 6.

In April 2005, Hicks contacted Visteon's benefits center and reported that she had received a call from the DOL regarding the Pierce's complaint that they had not received a COBRA notice.  Metzigian Dep. at 163-65.  The benefits center employee who took Hicks' call contacted Conexis, the COBRA administrator at the time, which verified that the notices were late and mailed them out on April 18, 2005.  *Id.* at 164.

Once they received the notice, Plaintiffs declined COBRA benefits because they could not afford to pay the retroactive premiums due for four months in a single, lump sum payment.  Dkt. No. 95-2, Darryl Pierce Dep. at 31-33 ("Darryl Dep.").  Darryl Pierce ("Darryl") testified that the Plaintiffs delayed dentist checkups and doctor visits because they could not afford them.  *Id.* at 31-32.

On September 6, 2005, the Plaintiffs filed a class action complaint alleging that Visteon violated the COBRA provisions of ERISA when it failed to provide timely notice of the putative class members' COBRA rights.  Dkt. No. 1, at 4-5.

### 2.  Data Feed Error

Visteon testified that in February 2005, its Health and Welfare Department discovered that some records for employees who had been laid off in late 2004 were not flowing through the payroll/benefits system correctly.  Metzigian Dep. at 166-69, 412-13.  Specifically, 25% of the records for the laid off employees erroneously listed them as active employees.  *Id.*  Visteon contacted the payroll administrator at the time, Fidelity, and learned that the problem was a data feed error from Fidelity to the benefits administrator, Towers-Perrin.  *Id.* at 166-69.  The issue was corrected, and COBRA notices were sent out to the affected employees in April 2005.  *Id.* at 166-69, 413. Visteon's testimony regarding whether the Plaintiffs were included in this group of employees is unclear, although there is evidence that COBRA notices for some of the other class members were sent on the same date as that for the Plaintiffs.  *See, e.g.*, Dkt. No. 248, Stipulation & Submission of Class Members, at 25 of 63, Record for Taggart, Jim.

Visteon characterized this discovery as one that occurred when a Visteon employee was doing her "normal day-to-day" activities.  Metzigian Dep. at 167-68.  *See also* Dkt. No. 267, Visteon's Trial Br. at 12-13 of 52.  However, Metzigian's testimony reflects that the discovery was more happenstance than routine because she stated that "randomly, any one of us one day could, . . . if we know there is a large number of people, we might look at something."  Metzigian Dep. at 167.

### 3. "Discharge" Coding Error

As part of its investigation into this matter in 2005, Visteon discovered an issue concerning the termination code for "discharge." *Id.* at 418; Metzigian Tr. Decl. ¶ 12. Visteon had inherited a two-digit code for "discharge" from Ford that did not register as a qualifying event for purpose of COBRA on the computer system. Metzigian Dep. at 418. The "discharge" code included not only employees separated because of gross misconduct (grounds for withholding COBRA benefits pursuant to 29 U.S.C. § 1163(2)), but also those separated for other reasons. Metzigian Tr. Decl. ¶ 12.

### 4. Potential Retirees

Although retried employees are not part of the Class, COBRA notice issues related to retirees may provide evidence of notice or a pattern or practice. Fed. R. Evid. 406. Salaried employees who retire from Visteon's various facilities at various points in time were entitled to receive COBRA notices for benefits not covered by their retirement program. Metzigian Dep. at 91, 96-97. In addition, there are at least three ways for employees who are close to retirement to "grow into" a retirement benefit that would include some, but not all the health, dental and vision benefits to which they were entitled as an employee. Metzigian Dep. at 48, 236-37, 241-42. Each program participant might have been entitled to receive a COBRA notice for those benefits not included in their "grow in" program. *Id.* In addition, certain employees were offered an opportunity to separate employment and be retirement eligible; however, Visteon did not know whether these separating employees did in fact retire, and thus, were entitled to COBRA notices for those benefits not covered by their retirement program. *Id.* at 242-

43.  Further, if a separating employee was eligible to retire, Visteon did not know if the employee did in fact retire when they separated from the company.  *Id.* at 238-39.

When a separating employee who is eligible to retire from Visteon does in fact retire, then that employee should receive a COBRA notice for all of his or her benefits. Metzigian Dep. at 239.  However, the COBRA administrators for Visteon had no idea if a separating employee had retired or not; rather, the COBRA administrator would only know that qualifying event had occurred and that a COBRA notice should go out.  *Id.* at 240-41.

Visteon has no explanation for why approximately 600 individuals who were retirement eligible and separated from Visteon from June 2002 through July 2004 were not sent COBRA notices.  *Id.* at 227, 243-48; Dkt. Nos. 249-3 & 249-4, Metzigian Dep. Ex. 7, Spreadsheet, Visteon Corporation Salaried Terminations, June 2002 thru July 2004.  Similarly, Visteon has no explanation for why the 588 individuals who were retirement eligible and separated from Visteon from July 2004 through 2008 were not sent COBRA notices.  Metzigian Dep. at 255, 262-63; Dkt. Nos. 250-1 & 250-2, Metzigian Dep. Ex. 8, Spreadsheet, Visteon Salaried Terminations from August 2004 to Present.

### 5. <u>Communication Breakdowns Between Third-Party Administrators</u>

In discovery responses from its third-party administrators generated as a result of this law suit, Visteon learned that a variety of technical problems caused employees not to receive timely COBRA notices.  Metzigian Dep. at 324; Metzigian Tr. Decl. ¶¶ 12-13. The problems included: (i) situations where a code regarding an employee's qualifying event was not properly fed from one administrator to another; (ii) situations where the

benefits administrator did not communicate termination data to the COBRA administrator or did so in an untimely manner; (iii) situations where the COBRA administrator did not send the COBRA package to a terminated employee or sent it late; and (iv) situations where an employee was a "term on term," meaning that the employee was on a non-COBRA eligible leave at the time that he or she subsequently had a COBRA-qualifying event, but the second event was not captured on the transmission from the benefits administrator to the COBRA administrator because the employee had not been at work actively.  Metzigian Dep. at 159-60, 166-72, 274, 278, 282; Metzigian Tr. Decl. ¶ 12; Dkt. No. 278-1, Metzigian *Shedlock* Dep. at 24-25.

## C.  CERTIFICATION OF THE CLASS

By Orders dated September 14, 2006, and October 4, 2007, the Court certified a class as follows:

> All Qualified Beneficiaries of group medical, dental, and/or vision, benefit plans administered by Visteon Corporation and/or Visteon Systems, LLC, in the United States, who were entitled to be provided notice of their COBRA rights due to a qualified event to a covered employee pursuant to 29 U.S.C. § 1163(a)(1), (2), and (4), and who were not provided said notice in a timely fashion pursuant to 29 U.S.C. § 1166, and whose claims arose within the statute of limitations applicable to the state of the facility in which the Qualified Beneficiary employed by Visteon Corporation and/or Visteon Systems, LLC, in the United States, worked and whose qualified event took place on or before September 6, 2005.

Dkt. No. 116.  The Court incorporates by reference the entirety of those orders, Docket Nos. 67 and 116.

## D.  NOTICE TO THE CLASS

Notice was sent to the Class between October 19, 2007, and October 31, 2007. Dkt. Nos. 107, 119.

18

### E.  CLASS MEMBERS

The parties have stipulated to a list of persons who are putative class members. The total number of individuals on the list is 1,593.  Dkt. No. 248-1.  The parties agree that the list includes 748 individuals who did not receive any COBRA notice or received their COBRA notice in a tardy fashion.   More specifically, 331 individuals have never received a COBRA notice.  *Id.*  Of the remaining 417 of the 748, 221 individuals were sent their COBRA notice over 470 days late, barely in advance of the 18-month COBRA expiration period.  *Id.*  Also with respect to the remaining 417 of the 748 individuals, 222 COBRA notices were sent after January 1, 2006, when Visteon was on notice of the Plaintiffs' class allegations.  *Id.*

The parties agree that fifty-four, 54, individuals out of the 1,593, should be excluded from the Class because they were never enrolled in benefits that would require a notice under COBRA.  Dkt. No. 283-2; Dkt. No. 267, Visteon's Resp. at 20-22; Dkt. No. 292, Plaintiffs' Reply, at 20.

The parties also agree that thirteen, 13, individuals out of the 1,593, should not be part of the Class because they either waived coverage or had no loss of coverage. Dkt. No. 267, Visteon's Resp. at 18-20; Dkt. No. 292, Plaintiffs' Reply, at 20.   Over Plaintiffs' objection, the Court concludes that an additional three, 3, individuals, Michael Munoz, Michael Simons and James Vendlinski, should also be excluded from the Class because Visteon presented sufficient evidence that these individuals were released to work for Ford successor companies and did not experience a loss of coverage.  Dkt. No. 279-2, Popp Decl. ¶ 18 & Ex. A thereto, at lines 791, 800 and 803.

Further, the Court concludes that an additional 770 individuals out of the 1,593, should be excluded from the Class because they were sent a timely notice of COBRA rights by Ford.  Over Plaintiffs' objection, the Court has allowed Visteon to present evidence it discovered in September 2012, which shows that during the period beginning in June 2000 through May 31, 2002, Ford included in its COBRA notices to 770 employees all the benefits in which the employee was enrolled at the time of that employee's qualifying event.  Dkt. Nos. 269-3 to 277-1, Dalal Decl. & Exs. thereto; 279-2 to 281-1, Popp Decl. & Exs. thereto.  To the extent it is necessary, the Court incorporates by reference its Order dated January 14, 2013, granting Visteon's Motion for Consideration of Evidence.  Dkt. No. 236.  However, Visteon's belated discovery of this information is evidence of its lack of diligence with respect to its responsibilities as benefits administrator and needlessly protracted this litigation.

Visteon argues that an additional four (4) individuals received timely notice,[4] but Plaintiffs dispute Visteon's evidence with respect to those individuals:  Julie Stabnick ("Stabnick"), Michelle Jordan ("Jordan"), Anna Rader ("Rader") and Robert Godfrey ("Godfrey").  Dkt. Nos. 267, Visteon's Resp. at 17-18; 292, Plaintiffs' Reply, at 19-20; 299, Visteon's Sur-Reply, at 1-2.  The Court agrees with Visteon that these four individuals should be excluded from the Class because they received timely COBRA notices.  Stabnick was provided timely notice on July 29, 2004.  Dkt. No. 249-3, at 3. Jordan was also provided timely notice on September 15, 2004.  Dkt. Nos. 281, Jordan COBRA Notice; 269-1, Metzigian Dep. Ex. 7.  Godfrey and Rader were also sent timely

---

[4] Visteon argued that an additional five individuals received timely notice, but later withdrew its argument with respect to Calin Ionescu, who remains part of the class.  Dkt. No. 296-1, at 2-3.

COBRA notices, within 11 and 18 days of their respective qualifying events.  Dkt. Nos. 281; 269-1, Metzigian Dep. Exs. 3, E & G.

Visteon argues that an additional eight (8), individuals should be excluded from the Class because they failed to disclose the existence of their COBRA claims in bankruptcy proceedings.  Specifically, the following chart summarizes the pertinent information:

| Name | Qualifying Event Date | COBRA Deadline/ Accrual of Claim | Bankruptcy Petition Filed | Bankruptcy Case Discharged |
|------|----------------------|----------------------------------|---------------------------|----------------------------|
| Greta Adams | 8/15/2004 | 9/28/2004 | 10/21/2004 | 3/18/2005 |
| Greta Adams | 8/15/2004 | 9/28/2004 | 5/26/2011 | Pending |
| Marcella Flannery | 10/25/2004 | 12/8/2004 | 9/10/2004 | 1/26/2005 |
| Helen Frasher | 10/31/2004 | 12/14/2004 | 7/24/2009 | 11/10/2009 |
| Jason Kuster | 1/11/2005 | 2/24/2005 | 6/18/2009 | 4/15/2010 |
| Parrett | 9/30/2004 | 11/13/2004 | 10/29/2008 | 3/2/2009 |
| Brenda Smith | 10/22/2004 | 12/5/2004 | 10/21/2004 | 3/18/2005 |
| Alice Whitecotton | 10/31/2004 | 12/14/2004 | 4/27/2007 | 8/15/2007 |
| Wyatt | 12/27/2004 | 2/9/2005 | 5/15/2011 | 9/7/2011 |

Dkt. Nos. 284-1 to -3; 285-1 to -4; 286-1 to -4; 287-1 to -4; and 288-1 to -4.  The Court takes judicial notice of the filing dates of these petitions and their contents as well as any other filings in those cases that are relevant to the issues in this matter, including orders of discharge.  *See In re Salen*, 465 F.3d 767, 771 (7th Cir. 2006).

The question of whether or not these individuals are included in the Class will be addressed in the Conclusions of Law section of this Order.

### F.  EVIDENCE OF HARM TO CLASS MEMBERS

In addition to their own evidence regarding harm, Plaintiffs presented evidence of harm to the following individuals: Jessica Wells ("Wells"), Wyatt, Whitecotton, Parrett

(also known as Donna Sherwood), Greta Steele ("Steele"), Hensley, Alfred, Kimberly Davidson ("Davidson"), Huffman, Kevin Trent ("Trent"), Johnny Knight ("Knight") and Jody Capshaw ("Capshaw").  Dkt. No. 262, at 10-27, and Affidavits, Depositions and/or Exhibits cited therein.

The Court has excluded Huffman's affidavit and Wyatt's second affidavit, both as a sanction and because they are hearsay; therefore, the Court will not consider evidence of any alleged economic damages suffered by Huffman and it will not consider any evidence in Wyatt's second affidavit with respect to her alleged entitlement to TAA benefits.

## 1. <u>Jessica Wells</u>

As to Wells, the evidence shows that while working and being insured by Visteon, Wells, her son, Tyler, and her daughters Meghann and Morgan, regularly saw their doctors and a dentist (including braces adjustments for Meghann), and received annual eye exams and/or received treatment from an Optometrist.  Dkt. No. 254-3, Wells Aff. ¶¶ 3-17.   During this time, Wells suffered from and was being treated for arthritis in her neck and knees.  *Id.* ¶ 4.  Visteon terminated Wells' employment on December 27, 2004.  *Id.* ¶ 23.  At that time, Wells was thirty-five years old, Morgan was thirteen years old, Tyler was fifteen years old and Meghann was sixteen years old. Wells received a notice of COBRA rights sometime in June 2006.  *Id.* ¶ 22.  She declined coverage at that time because she could not afford to pay eighteen (18) months of premiums all at once.  *Id.* ¶ 23.  Wells did not quantify her damages, but claims that she and Tyler went without prescription medication; that without the medication Tyler experienced depression and then dropped out of school; and that

Wells was treated, without insurance, for nodules on her lungs, shingles and depression. *Id.* ¶¶ 26-31. In addition to this pain and suffering, Wells states that she was very distressed by not having insurance for her children. *Id.* ¶ 33. Wells testified that she was eligible for TAA benefits. Dkt. No. 255-1, Wells Dep. at 24, 26.

## 2. Leesa Wyatt

As to Wyatt, the evidence shows that while working and being insured by Visteon, Wyatt and her daughter, Tamara, regularly saw their doctor and a dentist and had yearly eye exams. Dkt. No. 255-2, 1st Wyatt Aff. ¶¶ 3-9. Visteon terminated Wyatt's employment on December 27, 2004. *Id.* ¶ 12. At that time, Wyatt was thirty-three years old and Tamara was sixteen years old. *Id.* ¶¶ 10-11. Wyatt received a notice of COBRA rights sometime in June 2006. Dkt. No. 255-1, Wyatt Dep. at 19. She declined coverage because she could not afford to pay the eighteen (18) months of premiums all at once. Dkt. No. 255-2, 1st Wyatt Aff. ¶ 14. Prior to losing her insurance, Wyatt suffered from high blood pressure, colon issues and complications from a breast reduction procedure. *Id.* ¶ 17. Without insurance, Wyatt had to pay for treatment for these conditions out of pocket and Tamara was forced to forego annual check-ups. *Id.* ¶¶ 16, 18, 19, 22, 23. Wyatt incurred medical expenses in the amount of $4,245.50 between March 28, 2005, and April 6, 2006. Dkt. No. 255-4, Wyatt Medical Bills.

Wyatt filed a petition for bankruptcy on May 15, 2011. Dkt. No. 288-1, Wyatt Pet. for Chap. 7 Bankruptcy, May 15, 2011. She did not list her claim in this lawsuit as an asset in her petition, the content of which she affirmed was true under the penalty of perjury. *Id.* at 8 & 23 of 40. The case was discharged on September 7, 2011. Dkt. No. 288-2, Wyatt Discharge of Debtor Order, Sept. 7, 2001.

### 3. <u>Alice Whitecotton</u>

With respect to Whitecotton, while working for Visteon and being insured Whitecotton, her husband, Paul, a diabetic; her son, Brandon; and her daughter Veronica;  regularly saw their doctors and a dentist and received annual eye exams. Dkt. No. 256-1, Whitecotton Aff. ¶¶ 3-14.  Visteon terminated Whitecotton's employment on October 31, 2004.  *Id.* ¶ 19.  At that time, Whitecotton was forty-three years old, Paul was forty-four years old, Brandon was sixteen years old, and Veronica was fifteen years old.  *Id.* at ¶¶ 15-18.  Whitecotton received her notice of COBRA rights sometime in April 2006.  *Id.* ¶ 22.  She declined coverage because she could not afford to pay seventeen (17) months of coverage all at once.  *Id.* ¶ 23.  Whitecotton and her husband were uninsured for the period between November 2004 and April 2006; however, Brandon and Veronica were uninsured for only a short period of time until they received Medicaid through the State of Indiana.  *Id.* ¶¶ 24-25.  In October 2005, Whitecotton had surgery on her foot and incurred thousands of dollars in medical bills that she could not afford to pay.  *Id.* ¶ 29.  In addition, following her surgery, she did physical therapy at her home instead of with the assistance of a physical therapist.  *Id.* ¶ 30.

Whitecotton filed a petition for bankruptcy on April 27, 2007.  Dkt. No. 287-3, Whitecotton Pet. for Chap. 7 Bankruptcy, Apr. 27, 2007.  She did not list her claim in this lawsuit as an asset in her petition, the content of which she affirmed was true under the penalty of perjury.  *Id.* at 7 & 25 of 40.  The case was discharged on August 15, 2007.  Dkt. No. 287-4, Whitecotton Discharge of Debtors Order, Aug. 15, 2007.

### 4. <u>Donna (Sherwood) Parrett</u>

With respect to Parrett, while working for Visteon and being insured, Parrett regularly visited her dentist and had annual eye exams.  Dkt. No. 256-3, Parrett Aff. ¶¶ 3-4.  Parrett retired from Visteon on September 30, 2004, when she was fifty-eight years old.  *Id.* ¶¶. 3-4.  After her retirement from Visteon, she received medical benefits, but not dental or vision benefits.  *Id.* ¶ 7.  Parrett received her notice of COBRA rights sometime in April 2005, but she declined coverage because she could not afford to pay six (6) months of premiums all at once.  *Id.* ¶ 7.  Parrett was uninsured for dental and vision benefits for the period between October 2004 to March 2006.  *Id.* ¶ 10.  During this period, Parrett was forced to forego regular dental and vision check-ups; lost her partial plate denture and was unable to replace it; and could not afford new glasses.  *Id.* ¶¶ 9-11.

Parrett contacted Hicks at the Connersville plant regarding her COBRA notice.  Dkt. No. 260-2, Sherwood Questionnaire.  During the time she was uninsured, Parrett had dental bills totaling $451.50.  Dkt. No. 260-3.

Parrett filed a petition for bankruptcy on October 29, 2008.  Dkt. No. 286-3, Parrett Pet. for Chap. 7 Bankruptcy, Oct. 29, 2008.  She did not list her claim in this lawsuit as an asset in her petition, the content of which she affirmed was true under the penalty of perjury.  *Id.* at 8 & 21 of 36.  The case was discharged on March 2, 2009.  Dkt. No. 286-4, Discharge of Debtor Order, Mar. 2, 2009.

### 5. <u>Greta Steele</u>

With respect to Steele, while working for Visteon and being insured, Steele and her sons Nicholas and Brandon regularly visited their doctors and a dentist and had

annual eye exams.  Dkt. No. 257-1, Steele Aff. ¶¶ 3-9.  During that time, Steele suffered

from fibromyalgia and Brandon was treated for ADHD.  *Id.* ¶¶ 2 & 9.  Visteon terminated

Steele's employment on August 15, 2004.  *Id.* ¶ 13.  At that time, Steele was forty years

old, Nicholas was fourteen years old and Brandon was thirteen years old.  *Id.* ¶¶ 10-12.

Steele received her notice of COBRA rights sometime in January 2006.  *Id.* ¶ 14.  She

declined coverage because she could not afford to pay the outstanding premiums all at

once.  *Id.* ¶ 18.  Parrett was uninsured for the entire period between September 2004

and February 2006.  *Id.* ¶ 19.  Steele's sons, however, were uninsured for only a short

period of time until they received Medicaid through the State of Indiana.  *Id.* ¶ 19.

### 6.  <u>Jeanene Hensley</u>

With respect to Hensley, while working for Visteon and being insured, Hensley

regularly visited her doctor and a dentist.  Dkt. No. 257-2, Hensley Aff. ¶¶ 3-4.  Visteon

terminated Hensley's employment on October 31, 2004.  *Id.* ¶ 6.  At that time, Hensley

was forty-four years old.  *Id.* ¶ 5.  Hensley received her notice of COBRA rights

sometime in April 2006.  *Id.* ¶ 7.  Hensley had benefits start at her new employer on

October 26, 2005.  *Id.* ¶ 8.  Hensley canceled or delayed medical and dental exams and

testing because she did not have insurance.  *Id.* ¶¶ 9-11.

### 7.  <u>Katherine Alfred</u>

With respect to Alfred, while working for Visteon and being insured, Alfred, her

husband and her son regularly visited their doctors and a dentist and had annual eye

exams.  Dkt. No. 257-3, Alfred Aff. ¶¶ 3-12.  During that time, Alfred suffered from and

was treated for high blood pressure, degenerative arthritis, COPD, emphysema, back

problems and depression.  *Id.* ¶ 3.   In addition, Alfred's husband was treated for heart

and lung diseases.  *Id.* ¶¶ 6 & 7.  Visteon terminated Alfred's employment on March 14, 2005.  *Id.* ¶ 16.  At that time, Alfred was fifty-two years old, her husband was sixty-one years old and her son was eighteen years old.  *Id.* ¶¶ 13-15.  Alfred never received her notice of COBRA rights.  *Id.* ¶¶ 17-18; Dkt. No. 257-4, Alfred Dep. at 23-25.  Alfred and her son were uninsured from April 2005 until September 2006, a period of eighteen months.  Alfred Aff. ¶ 19.  During that period they were forced to forego regular treatment and check-ups.  *Id.* ¶¶ 20-21.

### 8. <u>Kimberly Davidson</u>

With respect to Davidson, while working for Visteon and being insured, Davidson, her husband and her son regularly visited their doctors and a dentist and had annual eye exams.  Dkt. No. 258-1, Davidson Aff. ¶¶ 3-11.  During that time, Davidson suffered from and was treated for shoulder issues, carpel tunnel syndrome and chronic pain; her husband suffered from and was treated for chronic pain, headaches and knee problems; and her son suffered from and was treated for seizures.  *Id.* ¶¶ 3, 4 & 9.  Visteon terminated Davidson's employment on March 8, 2005.  *Id.* ¶ 15.  At that time, Davidson was thirty-three years old, her husband was thirty-seven years old and her son was ten years old.  *Id.* ¶¶ 12-14.  Davidson never received her notice of COBRA rights.  *Id.* ¶¶ 16 & 17; Dkt. No. 258-2, Davidson Dep. at 22-23.  The Davidson family was uninsured from April 2005 until January 2006, a period of nine months.  Davidson Aff. ¶ 18.  During this time the Davidson family went without medication, Davidson's husband had to forego knee surgery, Davidson's son's seizures worsened and the family had to forego regular treatment and check-ups.  *Id.* ¶¶ 19-21.

### 9. <u>Kevin Trent/Johnny Knight/Jody Capshaw</u>

Plaintiffs presented evidence that Trent, Knight and Capshaw incurred dental and/or medical expenses during the relevant period, but proffered no additional information to corroborate their claims that the expenses were incurred because they were not informed of their right to continuing coverage.  Dkt. Nos. 260-1, Trent Medical Bills; 261-1, Knight Medical Bills; 261-2, Capshaw Dental Bills.  Plaintiffs have withdrawn any claim for monetary recovery by these class members.  Dkt. No. 262, at 2 n.1.

### III. <u>CONCLUSIONS OF LAW</u>

### A.  STATUTORY FRAMEWORK AND STANDARD

Under COBRA, after a qualifying event, an employer must provide notice to an employee of his or her right to elect continued insurance coverage for up to eighteen months.  29 U.S.C. §§ 1161, 1162(2)(A)(i).  More specifically, an employer must notify the benefit plan administrator that an employee has experienced a qualifying event within thirty (30) days of the date of that event.  29 U.S.C. §§ 1166(a)(1) & (2).  For the qualifying events at issue in this case, the plan administrator has fourteen (14) days from the date of such notification to send a COBRA notice to the qualified individual.  29 U.S.C. §§ 1166(a)(4)(A) & (c).  Therefore, a benefit plan administrator must provide notice of COBRA rights to qualifying terminated employees within forty-four days of the date of the employee's termination.  "[T]he use of a TPA cannot shield the administrator from liability for violations of COBRA's notification requirements."  *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 590 (7th Cir. 2011).  Visteon has the burden to prove that

adequate notice was provided.  *See Keegan v. Bloomingdales, Inc.*, 992 F. Supp. 974, 978 (N.D. Ill. 1998).

If a plan administrator fails to abide by the notice provisions of COBRA, the Court may, in its discretion, award a penalty of up to $110.00 per day from the date of the failure to provide timely notice.  29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1.  "The purpose of this statutory penalty is to provide plan administrators with an incentive to comply with the requirements of ERISA . . . and to punish noncompliance."  *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006) (citation omitted) (cited with approval in *Gomez*, 649 F.3d at 590-91).  Factors that courts have considered when determining whether or not to award such damages include the nature of the plan administrator's conduct, including its demonstration of good or bad faith, gross negligence or ill intent; and prejudice to the Plaintiffs and/or the Class.  *See Gomez*, 649 F.3d at 590-91 (citing, *inter alia*, *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1232 (11th Cir. 2002); *Starr*, 461 F.3d at 1040); *see also Fenner v. Favorite Brand Int'l, Inc.*, 25 F. Supp. 2d 870, 875 (N.D. Ill. 1998); *Gomez v. St. Vincent Health, Inc.*, No. 1:08-cv-153-SEB-DML, 2010 WL 1854106, at *3 (S.D. Ind. May 6, 2010).  Statutory penalties may be awarded even if the Court concludes there is no prejudice.  *See Gomez*, 649 F.3d at 590.

In addition to statutory penalties, the Court may "order such other relief as it deems proper."  29 U.S.C. § 1132(c)(1)(B).  The Seventh Circuit has stated that "the broad language of [this] subsection [] does not, on its face, preclude money damages."  *Gomez*, 649 F.3d at 588.  Although the *Gomez* court did not "condone without limitation . . . [monetary] compensation in COBRA-notification violation cases," it did affirm an

award of medical expenses incurred as a result of a COBRA notification violation, less deductibles and premiums that the beneficiary would have paid to obtain coverage under COBRA.  *Id.* at 588-89.

Pursuant to 29 U.S.C. § 1132(g)(1), "the [C]ourt in its discretion may allow a reasonable attorney's fee and costs of [the] action to either party."  The Seventh Circuit has described the analytical approach under this section in two ways.  *See Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000).  The first considers five factors:  (1) the degree of the losing party's culpability or bad faith; (2) the ability of the losing party to satisfy an award of fees; (3) whether an award of fees against the losing party would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.  *Id.* 592-93.  The second test considers whether the losing party's position was "substantially justified."  *Id.* at 593 (quotations and citations omitted). "Regardless of which test is used . . . the question asked is essentially the same: '[W]as the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent.'"  *Id.* (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)).  *See also Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, (7th Cir. 2011) (discussing the two approaches when a defendant is successful); *Anderson v. Hartford Life & Accident Ins.*, 772 F. Supp. 2d 1025, 1027 (S.D. Ind. 2011) (citing *Bowerman*).

## B.  VISTEON VIOLATED THE COBRA PROVISIONS OF ERISA BY FAILING TO SEND OUT NOTICES IN A TIMELY FASHION

With respect to Plaintiffs and the putative class members, Visteon was the plan administrator for purposes of COBRA and bore the responsibility to provide timely notice of such benefits to employees who experience a qualifying event.   Metzigian Dep. at 16.   The parties stipulated that 1525 members of Class [the number agreed to, minus the number stipulated as being excluded] were entitled to receive a COBRA notice but either did not receive a COBRA notice at all, or received a COBRA notice beyond the forty-four day statutory limit for such notice.  Dkt. Nos. 248-1, 283-2, 267 at 18-22; 292, at 20.   Plaintiffs objected to Visteon's late-discovered evidence that 771 putative class members received timely notice; however, the Court overruled Plaintiffs' objection and concluded that the evidence showed that those individuals should be excluded from the Class.  Dkt. Nos. 269-3 to 277-1; 279-2 to 281-1; 236.  In addition, the Court concluded that Visteon had proven that and additional three individuals (Michael Munoz, Michael Simons and James Vendlinski) should be excluded from the class because they had not had a qualifying event.  Dkt. Nos. 279-2 & Ex. A thereto.

## C.  PUTATIVE CLASS MEMBERS WHO FAILED TO INCLUDE THEIR CLAIM ON THEIR BANKRUPTCY PETITIONS MAY NOT BRING THEIR CLAIMS

Visteon contends that eight individuals, Adams, Flannery, Frasher, Kuster, Parrett, Smith, Whitecotton and Wyatt ("Bankrupt Plaintiffs"), should be excluded from the Class as a matter of law because they failed to disclose the existence of their COBRA claims in their bankruptcy petitions.  Dkt. No. 267, at 25-27.  More specifically, Visteon argues that the Bankrupt Plaintiffs lack standing because, once in bankruptcy, only the trustee may pursue claims on behalf of the debtor's estate and/or the Court

31

should judicially estop the Bankrupt Plaintiffs from asserting their claims here because they are inconsistent with their sworn statements in their bankruptcy proceedings.  *Id.*

Plaintiffs contend that the Bankrupt Plaintiffs have standing to bring their COBRA claims on behalf of their bankruptcy estates.  Dkt. No. 292, at 20-21.  In addition, Plaintiffs assert that there is no evidence that the Bankrupt Plaintiffs deliberately misled the bankruptcy courts or acted in bad faith to support a conclusion that these absent class members were attempting to manipulate the system.  *Id.* at 21-22.

Although Plaintiffs are correct that Chapter 13 debtors may file claims on behalf of their bankruptcy estates, *see, e.g.*, Fed. R. Bank. P. 6009; *Cable v. Ivy Tech State College*, 200 F.3d 467, 472-74 (7th Cir. 1999), Plaintiffs have provided no evidence that Adams, the only one to file under that Chapter, intended to do so in this case.  Rather, presenting no evidence of their own, Plaintiffs argue only that Visteon's evidence does not show that the Bankrupt Plaintiffs intentionally misled the bankruptcy courts or acted in bad faith.  This is not enough to show that Adams has standing nor is it enough to preclude application of the doctrine of judicial estoppel to bar the remaining Bankrupt Plaintiffs from participation as part of the Class.

In this case, there is only one Bankrupt Plaintiff who has an open bankruptcy petition – Adams.  Dkt. No. 284-1.  Adams' pending bankruptcy is under Chapter 13; therefore, she could, if she raises the issue in her petition and so states, bring her claim on behalf of her bankruptcy estate.  *Cable*, 200 F.3d at 472-73.  However, as previously mentioned, Plaintiffs present no evidence that Adams intends to bring her claim on behalf of her bankruptcy estate or has disclosed her claim in her pending bankruptcy. In the absence of such evidence, Adams does not have standing to bring her claim.

Adams' first bankruptcy petition was brought under Chapter 7, like those of the other Bankrupt Plaintiffs.  Under Chapter 7, "[t]he trustee has sole authority to dispose of property, including managing litigation related to the estate."  *Id.* at 472 (citing 11 U.S.C. §§ 541(a)(1) & 704(1)).  But, those bankruptcy petitions have been resolved; therefore, the Court believes the better legal construct to address the viability of the Bankrupt Plaintiffs' claims with respect to the closed cases is under the doctrine of judicial estoppel.  *Accord Canen v. U.S. Bank Nat'l Assoc.*, ___ F. Supp. 2d ___, Case No. 3:10-cv-0081-PPS-CAN, 2012 WL 6566694, at *5-6 (distinguishing *Biesek v. Soo Line R.R. Co.*, 440 F.3d 410 (7th Cir. 2006), where the bankruptcy at issue was ongoing and dismissing on standing grounds; from *Cannon-Stokes v. Potter*, 453 F.3d 446 (7th Cir. 2006), where the bankruptcy was closed, but the debtor had failed to disclose the pre-bankruptcy claim in the petition and applying judicial estoppel).

Judicial estoppel is an equitable doctrine that precludes the use of "intentional self-contradiction as a means of obtaining unfair advantage" and "prevents the perversion of the judicial process."  *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990).  It is well established "that a debtor in bankruptcy who denies owning an asset, including a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends."  *Cannon-Stokes*, 453 F.3d at 448 (listing cases from Puerto Rico, and the First, Third, Fifth, Eight, Ninth and Eleventh Circuits).  In making this discretionary decision, courts also consider whether the omission on a bankruptcy petition is the result of inadvertence or mistake, and whether or not the bankruptcy petitioner has made any move to amend schedules or re-open bankruptcy proceedings

to correct their errors.  *See In re Cassidy*, 892 F.2d at 642; *Cannon-Stokes*, 453 F.3d at 448.

After consideration of the evidence presented, the Court concludes that the Bankrupt Plaintiffs may not maintain their status as part of the Class.  First, the Court takes judicial notice of the Bankrupt Plaintiffs' petitions.  Dkt. Nos. 284-1 through 288-4. None of the petitions list this law suit as an asset.  *See id.*  Further, all of the Bankrupt Plaintiffs' claims against Visteon accrued prior to the filing of their bankruptcy petitions. As previously discussed, Adams even has a second petition pending, filed as recently as May 2011, but still failed to disclose her claim in this case as an asset and affirmed under penalties of perjury that this was true.  Dkt. No. 284-1, Adams Pet. for Chap. 13 Bankruptcy, May 26, 2011, at 9 & 22 of 41.  In addition to Adams, four other Bankrupt Plaintiffs filed false petitions after October 31, 2007, the approximate date by which they would have received notice of this class action.  Dkt. Nos. 284-1, Adams Pet. for Chap. 13 Bankruptcy, May 26, 2011, at 1; 285-3, Frasher Pet. for Chap. 7 Bankruptcy, July 24, 2009, at 1; 286-1, Kuster Pet. for Chap. 7 Bankruptcy, June 18, 2009, at 1; Parrett Pet. for Chap. 7 Bankruptcy, October 29, 2008, at 1; 288-1, Wyatt Pet. for Chap. 7 Bankruptcy, at 1.  Plaintiffs have relied upon the testimony and/or affidavits of three of the Bankrupt Plaintiffs, Parrett, Whitecotton and Wyatt, to support their argument that they are entitled to statutory damages and/or that these individuals themselves are entitled to monetary compensation for medical bills they paid when they were without insurance.  Yet, Plaintiffs present no evidence that any of the Bankrupt Plaintiffs moved to amend their petitions or moved to re-open their bankruptcy to include their claims for the benefit of their creditors.  This is particularly troubling in light of the Plaintiffs'

34

position that the Court should impose the maximum penalty allowed, which would amount to an award of approximately $55,000.00 per class member.

By hiding this lawsuit as an asset, the Bankrupt Plaintiffs seek to reap the windfall benefit of both having a full discharge of their debts and obtaining for themselves a judgment in an amount, in many cases, that exceeds that total debt expunged.  This is precisely the type of "perversion of the judicial process" that the doctrine of judicial estoppel was designed to prevent.  *Cannon-Stokes*, 453 F.3d at 448 (quoting *In re Cassidy*, 892 F.2d at 641).  Plaintiffs' implication that the Bankrupt Plaintiffs should be held to some lesser standard because they are "absent class members" is unpersuasive in the light of the purpose of this doctrine to raise the costs of lying and the responsibility to be truthful in all litigation no matter what your status therein.  *Cf. id.* at 448-49 (applying judicial estoppel even when the trustee had abandoned any interest in the litigation and the plaintiff had relied on the advice of counsel); *Wiggins v. Citizens Gas & Coke Utility*, No. 1:03-cv-1882-SEB-JMS, 2008 WL 4530679, at * 1-5 (S.D. Ind. Oct. 7, 2008) (applying judicial estoppel to the claim of a single litigant in a multi-plaintiff case alleging race discrimination based on disparate impact).  The Court concludes that the Bankrupt Plaintiffs with closed cases are judicially estopped from participation in the Class.[5]

---

[5] The parties did not brief the potential evidentiary ramifications of exclusion of the Bankrupt Plaintiffs from inclusion in the Class.  The Court has considered the testimony of the Bankrupt Plaintiffs on behalf of the remaining Class, but only as evidence of notice to Visteon and/or the type of harm typical to class members.  Fed. Rs. Evid. 105, 402.

### D.  COMPOSITION OF THE CLASS

In summary, the Class is comprised of the 1593 stipulated individuals, minus fifty-four (54) individuals who the parties agree were never enrolled; four (4) individuals who received timely notice; the thirteen (13) individuals the parties agree waived or never lost coverage; the additional three (3) individuals the Court concluded Visteon had established never lost coverage; the 770 individuals that Ford provided notice to, the evidence for which the Court admitted over Plaintiffs' objection; and the eight (8) Bankrupt Plaintiffs.  The Class is comprised of the remaining 741 individuals.

### E.  THE CLASS IS ENTITLED TO STATUTORY PENALTIES

Plaintiffs argue that the unwieldy nature of Visteon's COBRA notice system, its failure to provide regular oversight of its TPAs and its lack of institutional knowledge about the status of its employees provides the basis for a finding of bad faith.  In addition, Plaintiffs contend that the evidence demonstrates a pattern of system failures, some of which are addressed by this lawsuit, some that are not, that further justifies a conclusion of at least gross negligence if not willful indifference and bad faith.  Further, Plaintiffs assert that, even though the Court need not find prejudice to award statutory damages, the evidence supports such a finding in this case because class members avoided medical and dental treatment absent insurance and were required to make lump sum payments for retroactive coverage.  Plaintiffs contend that Visteon's behavior justifies the maximum $110.00 per day penalty.

In contrast, Visteon alleges that the evidence does not justify statutory damages because it did not willfully violate the law; the failure to send notices was the product of communication glitches between its third-party vendors, not something within its direct

control.  In addition, Visteon argues that prior to its discovery in 2007 of the technical problems with data transmission between its TPA, it had no notice of problems with its system; it reasonably believed the Plaintiffs' COBRA notice issue was an isolated incident.  Further, Visteon asserts that Plaintiffs have provided very little evidence of prejudice to the class members because very few responded to the survey and none evidenced actual expenses that exceeded premium payments.  Therefore, collectively, there is little support for any statutory damages award, much less the maximum award.

The Court concludes that there is ample evidence in the record that Visteon was grossly negligent or willfully ignored the COBRA notice provisions of ERISA prior to 2007 and that such disregard caused harm to its former employees who were entitled to notice.  Visteon's COBRA notice system was not reasonably designed to ensure that Visteon complied with the law.  Although the Court acknowledges that corporations with large workforces may need to utilize third-parties to administrate its various benefit programs, there is no evidence in the record to support a conclusion that Visteon knew whether or not its various (multiple) TPAs were properly administrating their individual functions at any given time until 2007 when it implemented the weekly audit system. Unlike the defendant corporation in *Gomez* (which had an audit system in place), until 2007, Visteon worked closely with its TPAs only in the first few months of a newly-formed relationship.  Metzigian Dep. at 31-32. There is no evidence of ongoing checks on the process or that Visteon kept tabs on the information flowing from its facilities to its TPAs' processing systems.  In fact, Metzigian testified that Visteon had no system in place to perform any routine checks.  Metzigian Dep. at 32-35, 42, 152-38, 158-59, 301, 304-09.

In addition, it took Visteon nearly two years from the date this lawsuit was filed to compile a list of potential class members and over seven years to determine that 770 individuals on its original list actually did receive a timely COBRA notice.  Dkt. Nos. 87, 88, 97, 98, 107, 236, 269-3 to 277-1, 279-2 to 281-1.   This is hardly evidence that Visteon diligently supervised, controlled or managed its COBRA notice system.  Further, Visteon admitted that it did not know at any given time the employment status of its employees, Metzigian Dep. at 32-35; therefore, it never knew when a qualifying event occurred and, correspondingly, which employees, if any, were entitled to a COBRA notice.   In other words, prior to 2007, Visteon never actively administered its own COBRA notice system; rather it left compliance up to third parties.  But, Visteon cannot hide behind its TPAs because Visteon acknowledged that it was the administrator under ERISA and as such, it is the responsible party.  *See Gomez*, 649 F.3d at 590 (stating that "in the absence of [] an oversight system, the use of a TPA cannot shield the administrator from liability for violations of COBRA's notification requirements").

Visteon makes much of the fact that it never received calls from employees regarding missing COBRA notices prior to that of the Plaintiffs'.  This is not credible in light of the multiple members of the Class who testified that they contacted a Visteon human resources person about their missing notices and the DOL letter that references a discussion with Hicks about Plaintiffs' complaints.  *See* Dkt. Nos. 254-1, Sharon's Aff. ¶ 5; 255-1, Wells Dep. at 18-19; Parrett Aff. ¶ 8; 256-4, Parrett Dep. at 10-11, 13; 257-3, Alfred Aff. ¶ 18; 257-4, Alfred Dep. at 23-25; 258-1, Davidson Aff. ¶ 17; 258-2, Davidson Dep. at 22-23; 249-2, DOL Letter.   Visteon claims that if one of its human resources persons received a call, they would have directed the employee to Visteon's Benefits

Center or to a COBRA administrator.  *See* Metzigian Dep. at 160-61.  Yet Visteon points

to no written policy or training program regarding this procedure.  In addition, in early

2005, Visteon itself discovered an error that occurred with employees who were laid off

in late 2004, but it did nothing at that time to determine if similar problems had occurred

with other large force reductions or even individual issues.  Given the timing of this

discovery coupled with Plaintiffs' complaints around the same time, Visteon surely was

on notice that it may have problems with its system for providing COBRA notices.

     With the evidence that was presented, it is not too surprising that complaints

never reached Visteon's headquarters or its TPAs because there is no evidence that it

was anyone's job at Visteon to keep track of which employees experienced a qualifying

event, much less whether that individual received a COBRA notice.  As previously

stated, Visteon admitted that it did not know at any given time which employee had

experienced a qualifying event and were thus entitled to a COBRA notice.  Metzigian

Dep. at 32-35.  Visteon characterized it as "daily routine" for employees in Metzigian's

department to check up on such things, but this is belied by the fact that Metzigian

admitted that it was by chance that anyone in the department caught the errors that

occurred with employees laid off at the end of 2004.  *Id.* at 167-68.  It is not even clear

from Metizigian's testimony regarding that incident whether or not Visteon ever really

knew who was affected by that error.  *Id.* at 166-69, 412-13.  As previously discussed,

even after discovery of this coding error, it never thereafter implemented any kind of

standard review process to ensure that other similar errors were caught until 2007, two

years after this law suit was filed.  This evidences that Visteon was indifferent to its

employees' rights to a timely COBRA notice.  Moreover, although they are not part of

this class action, the evidence shows that Visteon had no system in place for tracking when retirees were entitled to a COBRA notice, which further supports the conclusion that Visteon turned a blind eye to full ERISA compliance.  In short, there is no evidence that Visteon ever developed a comprehensive plan to ensure ongoing compliance with the COBRA notice provisions of ERISA prior to 2007.

Taken together, these facts compel a conclusion that Visteon willfully violated the COBRA notice provision of ERISA or, at best, was grossly negligent in performing its COBRA notice responsibilities during the relevant period.

With respect to prejudice, Plaintiffs have established that the Class suffered harm from Visteon's failure to provide timely COBRA notices.  Wells, Steele, Hensley, Alfred and Davidson testified that they had ongoing medical issues in their family for which they had to forego treatment because they did not have insurance.  *See* Dkt. Nos. 254-3, Wells Aff. ¶¶ 26-31; 257-1, Steele Aff. ¶¶ 20-21; 257-2, Hensley Aff. ¶¶ 9-11; 257-3, Alfred Aff. ¶¶ 3, 20-21; 258-1, Davidson Aff. ¶¶ 3, 4, 9, 19-21.  The evidence suggests that foregoing treatment had significant consequences for family members in at least two instances.  *See* Dkt. Nos. 254-3, Wells Aff. ¶¶ 27, 29 (son's ADHD worsened without medication); 258-1, Davidson Aff. ¶¶ 9, 19, 23 (son's seizures worsened without medication).  In addition, Wells, Steele, Hensley and Alfred testified that they experienced stress and anxiety because they had to forego medical treatment.  Dkt. Nos. 254-3, Wells Aff. ¶¶ 32-33; 257-1, Steele Aff. ¶22; 257-2, Hensley Aff. ¶¶ 9-11; 257-3, Alfred Aff. ¶ 22.  By foregoing treatment, the Class suffered prejudice.  *Accord, Holdford v. Exhibit Design Consultants*, 218 F. Supp. 2d 901, 909 (W.D. Mich. 2002).

Further, Wells, Wyatt, Whitecotton, Parrett and Steele testified that once they received their COBRA notice, they declined coverage because they could not afford the lump sum payment required to receive benefits retroactive to the effective date of their qualifying event.   Dkt. Nos. 254-3, Wells Aff. ¶ 25; 255-2, Wyatt 1st Aff. ¶ 14; 256-1, Whitecotton Aff. ¶ 23; 256-3, Parrett Aff. ¶ 10; 257-1, Steele Aff. ¶ 17.   These late offers were ineffective because if the Class member remained unemployed and still needed insurance, it was unlikely they could afford a lump-sum payment.   *Accord*, *DiGiovanni v. Guardian Life Ins. Co. of Am.*, Civ. Action No. 98-10908-GAO, 2002 U.S. Dist. LEXIS 12380, at *22 (D. Mass. June 28, 2002).   Although Metzigian testified that Visteon would have worked out a payment plan for the premiums for any former employee who made such a request, there is no evidence that such willingness was communicated to any of the class members by Visteon or by any of the relevant TPAs.   Therefore, the Class was still prejudiced because they were unaware of any offers to compromise Visteon may have made.

Moreover, Plaintiffs not only contacted Visteon directly about their missing COBRA notices, they sought help from Congressman Pence.   Plaintiffs received no relief from their own inquiry until the DOL contacted Visteon.   In addition, Plaintiffs hired a lawyer to represent them in this suit to recover statutory penalties for themselves as well as others who failed to receive notice.   Plaintiffs were prejudiced by Visteon's failure to react promptly to their concerns, which forced them to seek help outside the Visteon system.   *Accord Garred v. Gen. Am. Life Ins. Co.*, 774 F. Supp. 1190, 1201 (W.D. Ark. 1991) (stating that "aggravation, frustration, and the need to hire an attorney have been recognized as prejudice for the purpose of § 1132(c) claims").

Wyatt and Parrett testified that they paid for medical, dental or eye-care services while they were uninsured and seek equitable damages.   However, the Court has concluded that these individuals are judicially estopped from bringing their claims; therefore they may not recover any monetary damages.  *See* Section III. C.  The Court considers this evidence only to the extent that some class members paid for health expenses out-of-pocket while uninsured and is a form of prejudice.[6]

---

[6] Even if the Court considered this evidence, neither Wyatt nor Parrett would recover monetary amounts because their expenses did not exceed the premiums they would have had to pay.  It is unclear from Plaintiffs' opening brief how they intended to factor in the premiums that would be owed by these individuals to determine actual damages; however, in Reply, Plaintiffs assert that the Court should use the premium for a single insured; for the period of time for which the Class member required medical, dental or eye-care services only (not the entire uninsured period); and for all expenses, not just ones incurred prior to receipt of a COBRA notice.  Dkt. No. 292, at 18-19.  Visteon asserts that the proper calculation includes a premium equivalent to the coverage the Class member testified he or she would have chosen and its responsibility for any expenses would properly end when the Class member received a COBRA notice, regardless of timeliness.  Dkt. No. 267, at 35-42.

The Court cannot agree with Plaintiffs' argument that in calculating any amount of recoverable expenses, the Court should ignore the class members' testimony regarding the type of coverage they would have elected if it were offered timely or ignore completely the date upon which a particular Class member received notice of their COBRA rights.   Once notified, the individual was then fully informed of their options, which is the purpose behind the COBRA notice provision.  *See Mansfield v. Chi. Park Dist. Group Plan*, 997 F. Supp. 1053, 1057 (N.D. Ill. 1998).  Thus, the proper method to calculate any amount owed to a particular Class member is expenses minus deductibles and premiums incurred from the date of the qualifying event, to the date of any COBRA notice.  *See Chenoweth v. Wal-Mart Stores, Inc.*, 159 F. Supp. 2d 1032, 1042 (S.D. Ohio 2001).  Applying this rubric to Plaintiffs' evidence, neither Wyatt's nor Parrett's claims for monetary relief survive.  The Court adopts Visteon's calculations with respect to the alleged equitable damages for both Wyatt and Parrett.  *See* Dkt. Nos. 289-4, Wyatt Dep. at 24-26, 30 & Ex. 3 thereto; 255-4, Wyatt Med. Bills; 267, at 36-38 & 40-41, Visteon Resp.; 289-2, Parrett Dep. at 14-16 & Ex. 2 thereto; 260-3, Parrett Med. Bills; 262 at 37, Pls.' Br.

Huffman's claim for monetary damages was not considered at all by the Court because of its ruling granting Visteon's Motion to Strike.

In summary, the Court has concluded that Visteon willfully violated the COBRA notice provision of ERISA and that there was some prejudice to the Class, although equitable damages requiring monetary relief were not proven.   In weighing these factors, the Court concludes that a statutory penalty in the amount of $1,852,500.00 is warranted.  The Court may award up to $110.00 per day, per violation.  In many cases brought by single plaintiffs courts have awarded amounts ranging from $5.00 to $100.00 per day, for totals ranging from $323.00 to $27,610.00 per plaintiff.  *See, e.g.*, *Scott*, 295 f.3d at 1231-32 (affirming a statutory penalty of $20.00 per day ($10,800 total), after finding bad faith, but no prejudice); *Holford v. Exhibit Design Consultants*, 218 F. Supp. 2d 901, 909 (W.D. Mich. 2002) (awarding a statutory penalty of $55.00 per day ($27,610.00 total), after finding bad faith); *Chenowith*, 159 F. Supp. 2d at 1043-44 (awarding a statutory penalty of $5.00 per day ($1,020.00 total), after finding defendant had not acted in bad faith, but plaintiff had suffered prejudice, including unpaid medical expenses); *O'Shea v. Childtime Childcare, Inc.*, No. 01-CV-1264(DRH), 2002 WL 31738936, at *7 (N.D.N.Y. Dec. 2, 2002) (awarding a statutory penalty of $50.00 per day ($2,300.00 total), after finding prejudice to the plaintiff and the need for future deterrence); *DiGiovanni*, 2002 U.S. Dist. LEXIS 12380, at *19-22 (awarding a statutory penalty of $100.00 per day ($21,500.00 total), after finding no evidence of bad faith, but prejudice in the form of inability to pay retroactive lump sum); *see also Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068-69 (6th Cir. 1994) (affirming an award of $25,200.00, to be split amongst all of the plaintiffs, pursuant to 29 U.S.C. §1132(c)(1)(B), for failure to provide plaintiffs requested information about their benefit plan after finding neither bad faith nor prejudice); *Garred v. Gen. Am. Life Ins. Co.*, 774

F. Supp. 1190, (W.D. Ark. 1991) (awarding a statutory penalty of $50.00 per day ($15,775.00 total) pursuant to 29 U.S.C. § 1132(c)(1)(B), for failure to provide plaintiff requested information about her benefit plan after concluding that the court could not "determine whether the failure to respond was through neglect or misfeasance"); *Thomas v. Jeep-Eagle Corp.*, 746 F. Supp. 863, (E.D. Wis. 1990) (awarding $50.00 per day ($6,450.00 total), pursuant to 29 U.S.C. § 1132(c)(1) for failing to respond to plaintiff's request for information, after concluding there was no justification for the defendant's failure to respond); *Bova v. Am. Cyanamid Co.*, 662 F. Supp. 483, 490-91 (S.D. Ohio 1987) (awarding a statutory penalty of $10,000.00 pursuant to 29 U.S.C. § 1132(c), for the failure to provide timely information regarding a benefit plan, after finding bad faith in, among other things, "a series of procedural errors"). Here, the total penalty reflects the Court's rejection of Visteon's claims that it was a relatively innocent bystander, but acknowledges that the Class' evidence of prejudice is not substantial. Each class member would receive $2,500.00, which is substantially more than the award in the only other multi-plaintiff case the Court could locate pursuant to 29 U.S.C. § 1132(c).

The total penalty in this case is justified by Visteon's lack of internal systems for tracking the status of its employees, including the date upon which an employee sustained a qualifying event under ERISA; its failure to provide oversight for its TPAs on an ongoing basis until two years after this lawsuit was filed; the lack of a proven written policy for terminated employees and/or human resources personnel to follow when a terminated employee calls the company seeking information about COBRA coverage; Visteon's continued lack of acceptance of responsibility for its COBRA notice system as

plan administrator in this law suit; and its lack of diligence in discovering the names of the class members and/or discovering exculpatory information, some of which was uncovered as recently as September 2012.  Although the Class did not show prejudice in the form of recoverable equitable damages, this award of statutory penalties is further justified by the evidence of prejudice to the Class.  Specifically, prejudice occurred in the form of delayed medical treatment; stress from such delays, as well as having to pay for some medical treatment without insurance; the frustration of getting a late notice requiring a lump sum payment for retroactive benefits without knowing that compromise might be available; and, in the case of Plaintiffs (as well as others in the Class), the frustration of notifying Visteon of a delay in receiving a COBRA notice, but not getting a response apparently until the DOL got involved.  This penalty is large enough to act as a deterrent to Visteon and to others who similarly operate a large number of facilities and choose to use multiple TPAs to perform various benefit functions, but not so large as to be a windfall for the Class.  Each member of the Class shall be entitled to an equal share of the penalty.  The total number of individuals in the Class combined with the large number of total days late (on average, approximately 376 days late per class member) makes this award adequate to serve the purpose of the penalty yet is proportionate to the injury.

### F.  THE CLASS IS ENTITLED TO ATTORNEY'S FEES

In its discretion, the Court concludes that under either construct or test enunciated by the Seventh Circuit, an award of reasonable attorney's fees in this case is justified.  As discussed at length in the prior section, Visteon's system was not reasonably designed to comply with COBRA until at least 2007, two years after this suit

was filed.  In addition, it took Visteon seven years to discover that 711 individuals should be excluded from the Class because they received a timely COBRA notice.  This suggests a lack of due regard for the seriousness of this matter.  Further, Visteon's continued reliance on its mutli-layered set of TPAs and faulty information exchanges between them as an excuse for its failure to send COBRA notices in a timely fashion evidences Visteon's bad faith and cannot justify its position that no penalty should be awarded in this case.  Visteon had no oversight system in place to ensure that COBRA notices were sent by its TPAs; therefore, this case is easily distinguishable from *Gomez*, the case that Visteon relies upon to justify its position that the Court should not impose a penalty against it, and further supports the Court's conclusion that Visteon's arguments are without substantial justification.  With revenues of $13.8 billion in 2012, it is highly likely that Visteon can afford to pay both the penalty imposed by this Order and Plaintiffs' reasonable attorney's fees.

Plaintiffs did not provide an affidavit or other evidence of the reasonable attorney's fees they seek in this matter.  Therefore, Plaintiffs shall file their Motion for Reasonable Attorney's Fees, together with supporting affidavits and timesheets, on or before July 23, 2013; Visteon shall file its Response thereto on or before August 6, 2013; Plaintiffs shall file their Reply on or before August 13, 2013.  In order to facilitate the closure of this matter, no extensions shall be granted absent a showing of extraordinary hardship.

## VI. **CONCLUSION**

The Court has concluded that Defendants Visteon Corporation and Visteon Systems, LLC, have violated the Consolidated Omnibus Reconciliation Act ("COBRA"), 29 U.S.C. § 116, when they failed to send timely notice of COBRA benefits to Plaintiffs Darryl and Sharon Pierce, on behalf of themselves and all other similarly situated and as defined herein (collectively, the "Class"). The Court further concluded that the Class is entitled to a statutory award in the total amount of $1,852,500.00, to be shared equally among the Class; and to a reasonable attorney's fee, the amount of which will be determined separately.

IT IS SO ORDERED this 25th day of June, 2013.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Hannesson Ignatius Murphy
BARNES & THORNBURG LLP
hmurphy@btlaw.com

Koryn Michelle McHone
BARNES & THORNBURG LLP
kmchone@btlaw.com

Robert Anthony Prather
BARNES & THORNBURG LLP
tony.prather@btlaw.com

Ronald E. Weldy
WELDY & ASSOCIATES
weldy@weldylaw.com